### THE HIGH CLIFF.

(Circuit Court of Appeals, Second Circuit. January 26, 1921.)

No. 120.

1. Salvage ☞51—Appellate court may increase or diminish award.

The appellate court has power to increase or diminish the amount of a salvage award.

2. Salvage ☞34—Mere towing to safety low order of service.

The mere towing to safety of a drifting barge or scow is usually regarded as a salvage service of a low order of merit and is compensated by a small reward.

3. Salvage ☞26—Services in harbor not highly compensated.

Salvage services rendered in a harbor, where tugs are abundant and on the ground or near by are not of a high order.

4. Salvage ☞26—Award depends on circumstances of particular case.

Each case of salvage is to be disposed of on its own merits, and while the amount of compensation awarded is to some extent in the discretion of the court, it is guided by certain general principles, such as that when the risk was inconsiderable and the service slight the award should be

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

little more than compensation for the work done, but if the service was attended with unusual danger and difficulty the award should be proportionately higher.

5. Salvage ☞27—Excessive award reduced.

Where a barge lying alongside a steamship in a slip in the daytime, and having on board a cargo worth $200,000, broke loose during a severe wind storm and was drifting up the slip, when she was taken in charge by a tug lying in the same slip and pushed farther up the slip, where she was made fast to a pier in a protected place, the service requiring not to exceed three-quarters of an hour and being attended with no danger, an award of $5,000 *held* excessive and reduced to $2,500.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in admiralty by the Olsen Water & Towing Company against the barge High Cliff; the Warner Sugar Refining Company, claimant. Decree for libelant, and claimant appeals. Modified and affirmed.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

Harrington, Bigham & Englar, of New York City, for appellant.

Foley & Martin, of New York City (James A. Martin and George V. A. McCloskey, both of New York City, of counsel), for appellee.

ROGERS, Circuit Judge. The question which this case presents is whether an award of $5,000 for salvage services rendered to the barge High Cliff by the steam tug Marie Olsen on February 26, 1918, was excessive and out of proportion to the services rendered. As is usual in all cases of this nature, the claimant insists that the court below overestimated the salvage services, and on the other side it is as strongly insisted that the award cannot be so regarded.

[1] That it is within the power of this court to increase or to diminish the amount of a salvage award will not be denied. The testimony which was taken before the court below is all in the record, and this court may examine it for itself and reach its own conclusions. If it appears that an award is clearly inadequate or is unreasonably excessive, the court can modify it accordingly. Irvine v. The Hesper, 122 U. S. 256, 7 Sup. Ct. 1177, 30 L. Ed. 1175; The Connemara, 108 U. S. 352, 2 Sup. Ct. 754, 27 L. Ed. 751.

[2] The mere towing to safety a drifting barge or scow is usually regarded as salvage service of a low order of merit, and is compensated by a small award. Scows Nos. 1 and 10 (D. C.) 141 Fed. 477; The John Fleming (D. C.) 136 Fed. 486, affirmed in 144 Fed. 1021, 74 C. C. A. 680; 35 Cyc. 765.

[3] It has long been settled in this circuit that salvage services rendered in harbor cases, where tugs are abundant and on the ground or near by are not services of a high order. The O. C. Hanchett, 76 Fed. 1003, 1004, 22 C. C. A. 678.

[4] In some foreign countries the amount or proportion to be paid for salvage services is fixed by law. But in England and in this country the rate of salvage compensation is governed by no determinate rules applicable to all cases. The proper rate of compensation is nec-

essarily to some extent in the discretion of the court on a just estimate of all the circumstances of the individual case. Each case of salvage is to be disposed of on its own merits. There are, however, certain general principles which serve to guide courts in the exercise of their discretion. When the risk is inconsiderable and the service slight, the award should be little more than mere remuneration pro opere et labore. The Benjamin A. Van Brunt (D. C.) 164 Fed. 775. If the service is attended with unusual danger and difficulty, the award will be proportionately higher. Luckenback v. Scows 3 & 16 (D. C.) 50 Fed. 570. The highest compensation ordinarily allowed in the most meritorious cases is one moiety, which is rarely given except in the case of a derelict. While seldom more than one-half or less than one-third is given there are many cases in which the award has been under 5 per cent. In The Henry Frank (C. C.) 11 Fed. 763, which would seem to be an extreme case, a steamboat valued at from $35,000 to $40,000 broke from her landing in the harbor in a gale of wind, and without any steam or other propelling power and with only a watchman on board drifted down stream to her own peril and that of the shipping in the harbor. Two tugs went to her assistance and towed her after much trouble to a place of safety. A salvage award of $300 was allowed by the District Judge, and on appeal to the Circuit Court the amount was not disturbed; Circuit Judge Pardee saying that he saw no reason to disturb it, unless it should be as to the rate of distribution between the libeling boat and the crew—three-eighths to the men and five-eighths to the boat.

In Texas Co. v. Texas & Gulf S. S. Co. (C. C. A.) 263 Fed. 868, an award of $1,700 for taking up and towing to a place of safety a wooden barge found adrift and worth about $50,000 with a cargo of about 6,000 barrels of oil was held adequate by the Circuit Court of Appeals in the Fifth Circuit. The court in so holding stated that there had been no great danger to life or property in rendering the service. In the same case an award of $1,000 was held inadequate, and was increased to $3,500. The award was to an iron tank steamship, worth from $2,250,000 to $2,500,000, with a cargo worth about $300,000, for time lost and deviation from her course in towing the barge found adrift, causing a delay of 22 hours and 40 minutes.

We are not unmindful that in such cases as the one now before the court the amount allowed by the trial court is not to be lightly disturbed, as the trial court has much the duty of a jury. But it sometimes has happened that this court has thought that justice required it to increase the amount allowed below, as in Water Front Contracting & Lighterage Co. v. Goodwin-Gallagher Sand & Gravel Co., 252 Fed. 117, 164 C. C. A. 229, or to reduce it as in The George W. Elzey, 250 Fed. 602, 162 C. C. A. 618. And see The Kanawha, 254 Fed. 762, 166 C. C. A. 208.

[5] In the case now before the court the value of the services rendered by the tug are to be distinguished from cases involving rescue of vessels in open water, accompanied by great danger to life and property, or where the salvors display great daring or skill. Here we have a covered barge in a slip, partially protected from wind and sea.

The tug lying in the same slip and but a few hundred feet distant, came to the barge, put a line on her, dropped back farther into the slip, and berthed the barge to the pier. The services took a short time, and were rendered in broad daylight, and with a bargeman on the barge to handle the lines.

An examination of the record shows that the High Cliff is a covered wooden barge about 125 feet in length, and that she was constructed by uniting half of a carfloat and half of a boat known as the Stone Cliff. She was purchased by the claimant in October, 1917, for $4,-125.08, and she had on board at the time the services were rendered a cargo of aluminum worth $200,000.

The barge on the day in question lay alongside the steamship Yadkin, about 150 feet from the end of the pier at the foot of Thirty-First street, South Brooklyn. The barge was made fast to the steamer by two lines at each end. The master of the barge testified that he was awakened about 5 o'clock by the rough weather and by the heavy sea that had set in. A little before 7 o'clock the near line broke, and later the other lines broke, and the barge drifted up the slip. There is conflicting testimony as to whether the barge had broken loose from the steamship and was drifting up the slip when the tug took her in tow. The master of the barge testified that she had already broken loose, and those on the tug contended otherwise. Between the hours of 7 and 8 of the morning in question the velocity of the wind, as shown by the official in charge of the Weather Bureau at New York City, was 75 miles an hour. The tug took the barge in tow, and took her in tow within the slip, and pushed her farther over into the still waters of the slip.

The captain of the tug was asked on cross-examination how much time was consumed by the tug in rendering the service, and he replied about three-quarters of an hour. Another of the libelant's witnesses testified that it was between half an hour and three-quarters of an hour. No other witness testified on that subject for the tug. The master of the barge put the time at 10 minutes. We conclude, therefore, that the time actually occupied by the tug in the salvage service did not exceed three-quarters of an hour, and may have been considerably less than that.

It also appears that in pushing the barge up the slip the tug was simply pushing her where the wind was taking her. The captain of the tug was asked on cross-examination:

"With the wind blowing in the slip as you have testified, in which direction would she go? Toward the bulkhead or out into the bay? A. She would go up toward the bulkhead. Q. That would be a safe place? A. That would be a safe place, yes; if she moved at all, she would go up there. Q. It was up in that direction that you put her? A. Yes."

And the captain of the salvaged barge testified that he did not consider the barge was in any danger in drifting up the slip after he got past the Moran scow, and that he had already passed the Moran before the tug came to his aid. Asked as to the distance the tug was from the barge, he testified as follows:

"Q. About how much of the distance did the Olsen tow you, or push you, altogether? A. Just across the slip like. Q. Two or three hundred feet? A. Yes."

After the tug pushed the barge into the smooth waters of the slip no further service by the tug was rendered. The captain of the tug was asked:

"Q. You didn't do any pumping on her afterward? A. No. Q. And she moved all right. She didn't sink, did she? A. No; she did not."

The captain of the barge testified that he did not ask for the aid of the tug. His testimony was as follows:

"Q. Did you at any time request any one on the tug Olsen to take hold of you or render you any assistance? A. No, sir. Q. Are you positive of that? A. I am positive of that. Q. Did you have any conversation at the time that the tug Olsen first came up to you in regard to any assistance to be rendered? A. No, sir. Q. You didn't ask them for any assistance, of any kind? A. No, sir. Q. There has been considerable testimony here from several witnesses that the High Cliff was still made fast to the steamer at the time that the Olsen took you in tow, and that you were taken in tow at your own request. What do you say as to that? A. No; I was drifting up the slip when the Olsen took hold of me."

In this he was flatly contradicted by the captain of the tug who testified as follows:

"Q. I would like to know what, if anything, the captain of the barge said, or called out, before you put a line to him? A. 'Take me away from here,' he said, 'I am sinking.' Q. Are you able to state who he said that to? A. He said it right to me; I was up in the pilot house."

There is testimony in the record to the effect that a number of vessels sank that day, but it does not appear that any boat within a slip went down. That the storm was severe is admitted, although at the time the services were rendered it had not reached its climax. But at the time of the service, if the testimony of the captain is true as to the position of the barge, she was not in danger. If his testimony is not true, and the barge would have gone to the bottom if the service had not been given, she and her cargo could have been raised without great expense. The time actually taken in rendering the service was short, and the tug was at no time in danger.

In view of all the circumstances we have come to the conclusion that an allowance of $5,000 is not warranted, and that the decree should be modified, by reducing the amount so awarded from $5,000 to $2,500, and, as so modified, the decree should be affirmed.

It is so ordered.