### THE PHOEBUS.

### THE MARAVI.

District Court, S. D. New York.
Nov. 7, 1946.

Kirlin, Campbell, Hickox & Keating of New York City (Ira A. Campbell and Joseph Arcolio, both of New York City, of counsel), for Panama Transport Co.

Burlingham, Veeder, Clark & Hupper, of New York City (C. I. Clark and C. E. Wythe, both of New York City, of counsel), for Balboa Steamship Co., Inc.

KENNEDY, District Judge.

On March 30, 1944 S. S. Phoebus and S. S. Maravi were in a convoy bound north from Guantanamo to Boston. Maravi is a steel cargo vessel. Her length is 303 feet, her beam 47.2 feet, and her depth 21.7 feet. She displaces 2802 gross tons and 1522 net tons. She is equipped with reciprocating steam engines and a single right handed propeller. She steers by means of a Mac Taggart Scott telemotor, but is also equipped with hand steering gear.

Phoebus is a twin screw diesel engined steel tank vessel. Her length is 489.9 feet, her beam 64.1 feet, and her depth 31.7 feet. She displaces 8863 gross tons and 5341 net tons.

At about 11:41 P. M. on March 30, 1944 the two vessels collided at a point roughly 100 miles east of Watlings Island, in latitude 24°07′ north, and longitude 73°03′ west. The starboard bow of Maravi struck the port quarter of Phoebus in the way of her cross bunkers, at a point about 75 feet from the stern, the angle of collision being about 30 to 35 degrees.

The owners of Phoebus have filed their libel in rem, and the owners of Maravi have filed a cross-libel. All of the evidence concerning the collision itself is in deposition form.

On the evening in question the convoy, which consisted of 34 ships, was steaming blacked out on a course 7 degrees true at a speed of 8 knots. The weather was clear, with light clouds and moonlight; there was a light breeze from southeast and the sea was moderate.

The ships were in columns spaced 500 to 600 yards apart. In each column there were three vessels, standard distance between ships being 400 yards. Maravi's station was No. 12, that is to say she was the second ship in the first or port column. Phoebus occupied station No. 23, being the third and last vessel in the second column. Just prior to the collision both ships were on station, Phoebus bearing about 5 points abaft Maravi's starboard beam about 1600 feet away. The ship astern of Maravi was approximately on station; the ship abeam of her was possibly a little ahead of station. So far there is scarcely any conflict in the evidence.

There is, however, a discrepancy between the versions of the collision, as supplied by the two ships, in respect of the clock time of commands to the engine room and the time of the collision itself. As always in such cases, there is also a dispute as to the place of collision, a matter with which I shall deal later.

The time discrepancy is not difficult to reconcile.

Maravi says in her smooth log [1] that her steering gear failed at 11:35 and that she began to turn to the right, switching on her out-of-command lights at 11:36. She then (11:38) says she stopped her engines, went full astern at 11:40, and was in collision with Phoebus at 11:41. In her secret log [2] she says that her steering gear "gave out" at 11:35, that she commenced to sheer over to starboard at 11:37 and that the result was a collision with an oil tanker coming from abaft the beam which

---

[1] Exhibit Q.      [2] Exhibit X.

struck Maravi's starboard bow. Her rough log and her engine log both indicate that she stopped her engines at 11:38. [3]

The log entries of Phoebus are not as clear as they might be. However, in her secret log [4] she says that at 11:34 she sighted the breakdown lights on Maravi, and that the collision occurred at 11:39. She describes her maneuvers during the interval as follows:

(1) full ahead port engine and hard right rudder.

(2) stop, and then full astern starboard engine (still full ahead port and hard right rudder).

(3) stop, and then full ahead starboard engine (still full ahead port and hard right rudder).

I am asked by each ship completely to ignore the logs of the other. In fact, it is strongly suggested by each ship that the other is under grave suspicion because her logs were "tampered" with. I have tried not to be naive about this. But the secret logs, and everything else in the case, persuade me that the versions given by both ships concerning commands to the wheel and the engine room are substantially accurate. In other words, I mean that I am prepared to accept Maravi's story that her steering gear failed at 11:35 P. M. and that she displayed breakdown lights at 11:36 P. M., in each case the time being by her own ship's clocks. I also accept as true the story which each ship gives of her maneuvers and the sequence in which they occurred. For it is highly likely, at least to me, that in the secret logs the masters were quite candid. At the time of the collision secret logs were not available as evidence in any Court. Nothing would be gained by falsifying them, and on the other hand the motive to tell the truth must have been strong. The discrepancies pointed out by each side as a basis for a charge of tampering are probably innocent, particularly since the entries were made in dimly lighted engine rooms during war time aboard ships steaming in convoy, when any command from the bridge might import a dire emergency, and

innocent mistakes in recording maneuvers were quite likely to occur.

This brings me to a factual situation under which Maravi claims she displayed her breakdown lights at 11:36—Phoebus that she saw those lights at 11:34. Maravi says that the time of the collision was somewhere between 11:41 and 11:42—Phoebus that it occurred at 11:39. The solution of the problem is obvious: either Maravi's bridge time was two minutes fast, or Phoebus' bridge time was two minutes slow. In everything that follows I have simply synchronized the bridge time of both ships on the basis of Maravi time, which places the time of Maravi's breakdown at 11:35, as she says, and the collision at approximately 11:41, as she also says. This means that Phoebus sighted the out-of-command lights not at 11:34, but at 11:36, Maravi time. The engine room time of Phoebus was apparently two minutes behind bridge time, and so there must be added to the time of each entry reflected in her rough engine room log [5] a correction of four minutes plus.

The libel of Phoebus specifies 10 varieties of fault against Maravi; Maravi's specifications of fault are 12 in number. However, the briefs make it plain that the claims of fault can all be disposed of by the determination of three ultimate questions:

(1) Was Maravi at fault under the circumstances because of the failure of her steering gear?

(2) Was either ship, or were both ships, guilty of faulty navigation?

(3) Was either ship, or were both ships, at fault in respect of lookout, lights, or the sounding of signals?

Maravi argues that despite the failure of her steering gear, she should be exonerated of any fault because that failure was a "condition", not a cause of the collision. Substantially, this means that even if the primary cause of her sheer to starboard was the failure of her steering gear, Maravi should nevertheless be acquitted if after that event she did everything possible to avoid disaster, and Phoebus did not.

---

[3] Exhibit O and S respectively.
[4] Exhibit Y.

[5] Exhibit 2.

This argument implies that when a vital part of a ship's navigating equipment has failed the trier of the facts must treat that failure as a "condition", and must begin the inquiry into causation at that point.

I do not agree with this position. I think the inquiry into fault goes further back, i.e. to the circumstances leading up to and surrounding the breakdown. Maravi does not quite take the position of the out-of-command ship in The Llanover, 1945, 79 Ll.L.R. 159: "My steering gear has jammed and therefore I can do nothing". She admits that even after the breakdown she was under a duty to do everything possible to avert collision. But nevertheless the doctrine of that case applies: "I think that the burden is cast upon her of showing that the jamming could not have been avoided by the exercise of reasonable care and skill on her part, or at any rate that she used all reasonable care and skill to prevent the jamming of the gear and that it might reasonably have jammed for a cause which she could not have prevented by the exercise of reasonable care and skill."

This rule is stated in another way by Judge Hough in The Woodmancey, 2 Cir., 1927, 18 F.2d 79, 80. In that case the decree of the District Court was reversed, on grounds not relevant here, but the statement of then District Judge A. N. Hand nevertheless clearly embodies correct principle (The Woodmancey, 1925 A.M.C. 1059, 1060, not officially reported): "Stout, perfect ship's tackle is vital to safe navigation and most convincing proof must be offered to sustain the defense of inevitable accident."

This language is quoted with approval in The Meanticut, D.C.S.D.N.Y., 1945, 65 F.Supp. 203. True enough, The Woodmancey, supra, dealt with a ship's cable and The Meanticut, supra, with defective wiring in the steering engine room. And in both of those cases the defense of inevitable accident was interposed, which so far as the pleadings are concerned, is not true here. But I am satisfied that when a ship's steering gear fails or jams she must demonstrate by strong proof that she exercised reasonable care and skill to avoid such an occurrence, whether this process be called rebutting a rational inference, or sustaining a burden. Any other rule would be dangerous, certainly in the case of ships traveling the high seas in convoys so stationed that even a temporary and otherwise trivial defect might bring on disaster.

If Maravi was called upon in this case to explain the failure of her steering gear, as I think she was, she certainly did not carry out that duty. When Maravi left port her steering engine was tested,[6] but it is extremely doubtful that the test was adequate. On March 30, 1944, the day of the accident, Maravi's helmsman noticed during the first watch (9:00 A.M.) that although she was "steerable" the wheel was slack so that he had to use twice the amount of wheel normally employed.[7] At 11:00 P.M. (41 minutes before the collision) an inspection was made by the Chief Engineer of the steering engine, but none of the telemotor line.[8] While at her port of refuge Maravi discovered a leak on the starboard plunger of the bridge telemotor.[9] A decision was taken to remove the packing on both plungers at that time. This packing had not been renewed for 17 months.[10]

On the basis of all this, I am compelled to find Maravi at fault, not merely because her steering gear failed, but because she did not rebut the inference of fault by proof that she was not to blame, or that the cause of the failure was something which she could not control.

Was either ship, or were both ships, guilty of faulty navigation?

It might be well before discussing specifically the handling of these two vessels on the night when the collision occurred, to make mention of some principles which I believe are generally applicable. I have no doubt that when a ship sights an out-of-command signal on another ship nearby, the former is under a distinct duty to keep out of the way. This was the duty of Phoebus in the case at bar. It would be her duty even if she had a privilege against Maravi.

6 Posseno, S.M. 135 (Ex. AA1)
7 Cathcart, S.M. 163, 164 (Ex. AA1)
8 Posseno, S.M. 131, 132.
9 Posseno, S.M. 127.
10 Posseno, S.M. 143.

It is equally clear to me that to the extent that it is within her power the out-of-command ship must do nothing which would annul or render dangerous the maneuver which the ship under control is making in order to keep clear (Owners of Mendip Range v. Radcliffe, 6 Ll.L.R. 375).

Maravi takes the position that Phoebus was badly handled prior to the collision. Under the theory suggested by Maravi, Phoebus was wrong on two counts: (1) she simply steamed ahead and did nothing (the story she now tells being made out of the whole cloth), or (2) if Phoebus did what she now says she did, it was faulty navigation nevertheless. Since the first of these charges involves a discussion of the exact place of the collision, which I intend to touch upon later in a slightly different connection, I will say nothing about it at this point. I am now assuming that Phoebus sighted the breakdown lights of Maravi at 11:36 and that her watch officer immediately ordered his port engine full ahead and the wheel put hard right, the starboard engine remaining at standard speed ahead. Hearing the engine room telegraph, the master of Phoebus then went to the bridge. When he got there he at once formed the impression that he could not avoid collision unless Phoebus turned more sharply to starboard. And so he stopped and reversed his starboard engine (11:38, Maravi time).[11] Concluding that even this maneuver would not be successful because Phoebus was not drawing away from Maravi fast enough, the master of the former then ordered his starboard engine full ahead (11:40).[11] But Maravi struck Phoebus on the port quarter approximately a minute later.

At all times between 11:36 and the time of the collision, the rudder of Phoebus was hard right, i. e., she was turning away from the danger. Was this prudent navigation or not?

Maravi suggests that the collision could have been averted if Phoebus had turned to port, or had stopped and backed both engines. Concerning the first contention, it must not be overlooked that there was a ship astern of Maravi in the first column and that Maravi, certainly by 11:37, had taken a sheer to starboard. It is more than likely that if Phoebus under these conditions had elected the maneuver to port she would have either hulled Maravi or the ship astern of her. On the other hand, if Phoebus had held her course but backed both engines it is quite probable that the disaster would have been much worse because she would herself have been hulled by Maravi.

Under the circumstances, I cannot help but think that the action taken by the watch officer of Phoebus, and by her master after his arrival on the bridge, was not only instinctive but right. Perhaps the best proof of this lies in the fact that the maneuver of Phoebus nearly succeeded. (The point of impact on the side of Phoebus was only 75 feet from her stern.)

Did Maravi do anything to annul or render dangerous the action which Phoebus was attempting to take in order to keep clear? I believe she did. Although the failure of her steering gear was at 11:35, she did not stop her engines until 11:38, nor send them astern until 11:40. It is true that when he became conscious of the breakdown, the watch officer on Maravi took off some 14 turns. Maravi's people attempt to explain their failure to stop and back earlier because there was a ship astern, only 400 yards distant. I am tempted to give the watch officer on the ship following Maravi credit for the obvious maneuver, namely, a sheer to port on his part, bearing in mind that he had plenty of sea room in that direction. However, even if he held his course and speed he would be clear of Maravi well before the time when the latter says she stopped and later reversed.

Phoebus advances a further criticism against Maravi. She says that she should have immediately shifted to hand steering, and there is some testimony in the record which gives color to this criticism. But even so, given a breakdown at 11:35 P.M. and a collision at 11:41 P.M. I find it hard to believe that failure on the part of Maravi to shift to hand steering was

---

[11] Exhibit 2. I have added four minutes to the actual Phoebus entry.

one proximate cause of the disaster. It is quite unlikely that even a man-of-war could in that time make a change of that character, and still have time enough to avert collision by hand steering.

■ On the whole it is my conclusion that there was no fault on the part of Phoebus in respect of navigation or handling and that it was a fault on Maravi's part that she did not stop and back sooner than she did.

Was either ship, or were both ships, at fault in respect of lookout, lights, or the sounding of signals?

■ Each ship in this case charges the other with fault because of failure to display running lights. It is certain that this charge does not lie against Maravi. Having hoisted out-of-command lights, it would have been a piece of folly to display running lights also. If I am right, Phoebus saw the breakdown signal as soon as it was given. She knew Maravi's position in the convoy, and what the display of running lights would have added I cannot see. The same thing is true concerning Maravi's charge against Phoebus that she should have lighted her lights. To paraphrase the language of Judge Learned Hand in a recent case (Lind v. United States, 2 Cir. 1946, 156 F.2d 231, 233): it presses scepticism beyond all reasonable bounds to suppose that the presence of lights on Phoebus could possibly have changed the navigation of Maravi, especially when one considers that the latter was out of control.

Phoebus complains that immediately after the breakdown Maravi's watch officer sent one lookout below to call the captain. Maravi says that Phoebus was at fault in respect of lookout because the breakdown lights were seen on Phoebus, not by a lookout, but by the helmsman. It seems to me that a simple answer to both these contentions is that in this case both ships had lookouts posted at proper places, and there is not the faintest causal connection, or possibility of causation, between the conduct of either ship in respect of lookout and the disaster.

Everything I have said about lights and lookouts applies with even stronger force to the charge that either one of these ships should have sounded a whistle signal. Maravi's steering gear had failed and she did not know where she was going. A blast of the whistle might well have indicated to Phoebus that Maravi was deliberately making a course to starboard which, of course, would contradict the out-of-command lights. On the other hand, those on Maravi could not possibly be helped by the knowledge that Phoebus was making a course to starboard. Beyond doubt they saw that she was, but no matter what signal Phoebus made Maravi would have continued on the course she was making because she had no choice.

■ On the basis which I have outlined I acquit both ships of fault in respect of lights, lookouts, or whistle signals.

■ Finally, I come to the argument which Maravi most vigorously asserts and which is perhaps her main reliance. She urges most earnestly that the story given by Phoebus concerning her own maneuvers between 11:36 P.M. and 11:41 P.M. is made up out of the whole cloth, in that it was physically impossible for the collision to have occurred as Phoebus claims it did. Maravi says that the collision did not occur in the wake of the third column, as Phoebus says, but in the wake of the second column, as Maravi's master testified. Upon the basis of this hypothesis, Maravi argues that Phoebus did nothing but steam straight ahead on her course, and is therefore guilty of gross fault. Maravi's theory is graphically shown in an appendix to her brief.[12]

This case was tried entirely on depositions, so far as the testimony of eye witnesses to the collision is concerned. There was no chance to apply to these witnesses the tests of credibility available when testimony is received in open court. Therefore is becomes apparent that in spite of the already inordinate length of this opinion, Maravi's argument ought to be analyzed carefully, since if she is right, no weight at all can be given to the depositions of Phoebus' people.

---

[12] Maravi's brief, appendix B.

But I think Maravi is wrong. Her argument is fallacious principally because on the basis of Maravi's own testimony no one could possibly plot her course from the time of the breakdown to the time of the collision. None of her people had the faintest idea what her rudder angle was, what her compass headings were (at least until the time of the collision and then only vaguely), or what her speed through the water was. Her depositions in fact create a picture of dire confusion on her bridge, which is wholly understandable in the circumstances. Maravi's theory of the course she took, as she now depicts it, shows that she merely "sagged" to the right. And this injects into the matter another circumstance pointing to the improbability of her graphic reconstruction of her own movements.

In all likelihood when Maravi's steering gear failed at 11:35 she had some degree of right rudder, because at the time her helmsman discovered the failure he was attempting to put his wheel to the left. Assuming that her rudder was then right, and had jammed, Maravi would not follow anything like the course which she now suggests: she would not "sag". She would, on the contrary, describe something approaching a circle, no matter what her speed was or how she changed it.

On the affirmative side, if one assumes that Maravi was turning (not sagging) to the right, it is clear that the collision could have taken place in the wake of the third column, where Phœbus says it did occur. Moreover, even if the maneuvers of Phœbus only approximated those she now describes, the collision could have taken place quite close to the exact spot where Phœbus claims it did.[13]

---

[13] It is difficult to avoid being lured into an attempt to reconstruct the movements of Phoebus and Maravi between 11:35 P. M. (the breakdown) and 11:41 P. M. (the collision). When Maravi first realized that her rudder was jammed, she was on a course 7 degrees true. The bearing of Phoebus was then 5 points abaft Maravi's beam and the distance between the ships 1600 feet. This means that the true bearing of Phoebus from Maravi was about 138 degrees. Both ships were traveling at 8 knots. These initial positions of the ships, as I have outlined them, are not the subject of any doubt or controversy.

But to attempt to trace the ships from those positions to the point of collision is to pile assumption on assumption, and no one recognizes it better than I. However, if just prior to 11:35 P. M. Maravi's rudder was jammed about 10 degrees right, it is at least within the realm of possibility, I think, that she was describing a turning circle whose final diameter was about 1000 yards. Under these circumstances, Maravi's advance for a 90-degree turn might be 1000 yards, her transfer for the same turn 500 yards, and her tactical diameter 1100 yards. Giving Phoebus credit for the maneuvers she describes (11:36 hard right rudder, full ahead port, standard ahead starboard; 11:37 hard right rudder, full ahead port, stop starboard; 11:38 hard right rudder, full ahead port, full astern starboard; 11:39 hard right rudder, full ahead port, stop starboard; 11:40 hard right rudder, full ahead both; 11:41 collision), it is obvious that she would describe a tighter turning circle than would Maravi. She probably had some 35 degrees of rudder (full) and the use of her engines would manifestly decrease the final diameter of her normal turning circle with full rudder, at least until 11:-40. It is, therefore, not impossible that the diameter of Phoebus' turning circle was about 800 yards, her advance for a 90-degree turn about the same distance, her transfer for a 90-degree turn about 400 yards, and her tactical diameter about 900 yards. If all these assumptions are correct (and I don't say they are), a collision could have occurred roughly at a point bearing from the original (11:35) position of Maravi 63 degrees true and about 1200 yards away, the same point bearing from the original (11:35 P. M.) position of Phoebus 35 degrees true and roughly 1100 yards away. This point is in the wake of the third column. If the collision occurred there, Maravi (considering her wider turn) traveled a greater distance in the intervening six minutes than did Phoebus. However, Phoebus was under hard right rudder for all of the five minutes preceding the collision, and three minutes before the collision she went full astern starboard. Maravi, on the other hand, although she took off turns, did not stop her engines until three minutes before the collision, and did not go astern until one minute before. I do not know what effect hard right rudder would have on the speed of Phoebus. But I should think she might well have

Even in the absence of exact data, it seems unlikely to me that any ship took the course depicted by Maravi in her diagram. On the other hand, it seems to me, as I have said, not only physically possible but highly probable that the ships collided where Phœbus says they did, namely, in the wake of the third column.

If I am right in all this, there is no inherent or intrinsic want of credibility in the story given by Phœbus. On the contrary it is strongly probable that she is telling the truth about the way she was handled, and that the collision occurred substantially as she says it did.

Phœbus is entitled to a decree in her favor. Maravi's cross-libel is dismissed. Submit decrees. I have filed findings of fact and conclusions of law.

covered much less ground under the circumstances than did Maravi.

Naturally, I have not made any findings of fact on the basis of this attempt to retrace the movements of the ships. It involves too much guesswork and too little actual data. I have thrown out these suggestions fully realizing that together they constitute a very shaky structure. At the very least, however, they show that under the known circumstances a collision in the wake of the third column was not impossible, as Maravi says it was. My finding that it did take place there is based on the probabilities as they are shown by the whole record.